J-A18026-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: D.D.C.S., A MINOR | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>:<br>: |
| APPEAL OF: W.C.S., III, FATHER | :<br>:<br>:<br>:<br>:<br>: |
| | : No. 299 WDA 2026 |

Appeal from the Decree Entered February 3, 2026
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2025-A0101

BEFORE: PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:           **FILED: August 12, 2026**

Appellant, W.C.S., III ("Father"), appeals from the decree entered in the Erie County Court of Common Pleas, granting the petition of Appellee, Erie County Office of Children and Youth ("OCY"), for involuntary termination of Father's parental right to his minor child, D.D.C.S. ("Child"). We affirm.

The relevant facts and procedural history of this appeal are as follows. Father and S.M.N. ("Mother") are the natural parents of Child. Child was born in November 2012. On February 7, 2023, Father was incarcerated in a federal prison for possession of methamphetamine with intent to distribute. Mother was left to care for Child and his two minor siblings. On July 16, 2024, Mother left Child's siblings locked inside a vehicle for an extended period. Mother was then arrested and charged with endangering the welfare of a child. On July 17, 2024, OCY obtained a verbal emergency protective order for Child and his

siblings.

On July 19, 2024, OCY filed a dependency petition for Child. The court held an adjudication hearing on July 30, 2024, where Father stipulated to the allegations set forth in the petition. On August 2, 2024, the court adjudicated Child dependent. The court established a permanency goal of reunification with a concurrent goal of adoption. Father's permanency plan included the following objectives: "1) Avail himself to any/all services while incarcerated; and 2) Reach out to [OCY] upon release from incarceration to develop a treatment plan, including visitation." (*See* Petition for Involuntary Termination of Parental Rights, filed 9/16/25, at 5) (unnumbered).

The court subsequently conducted regular permanency review hearings. At each hearing, the court determined that Father was not compliant with the permanency plan. Additionally, the court determined that there had been no progress by Father toward alleviating the circumstances that necessitated the placement. On April 2, 2025, the court ordered Child's permanency goal to be changed to placement with a legal custodian.

On August 15, 2025, OCY filed a petition for the involuntary termination of Father's parental rights. The court conducted termination hearings on January 7, 2026 and January 30, 2026. By decree entered February 2, 2026, with notice sent to the parties on February 3, 2026, the court terminated Father's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2),

(5), (8), and (b).[1]  Father timely filed a notice of appeal and concise statement

of matters complained of on appeal on February 24, 2026.

Father now raises five issues for this Court's review:

> Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(1) of the Adoption Act, when insufficient evidence was presented to indicate that [Father] had evidenced a settled purpose of relinquishing rights.

> Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(2) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions and causes of incapacity, abuse, neglect, or refusal to parent the child could or would not be remedied.

> Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(5) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions that led to placement had not been remedied after six months of placement.

> Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(8) of the Adoption Act, when insufficient evidence was presented to indicate that the conditions that led to placement had not been remedied after twelve months of placement.

> Whether the trial court abused its discretion in finding grounds for termination of parental rights existed under Section 2511(b) of the Adoption Act, when insufficient evidence was presented relative to the subject child's bond with [Father], nor was objective evidence concerning the child's best interests presented.

---

[1] In a separate decree, the court also terminated Mother's parental rights. Mother is not a party to the current appeal.

- 3 -

(Father's Brief at 4-5).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 667 Pa. 268, 294-95, 255 A.3d 343, 358-59 (2021) (internal citations and quotation marks omitted).

OCY filed a petition for the involuntary termination of Father's parental rights on the following grounds:

### § 2511.  Grounds for involuntary termination

   **(a)    General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the

following grounds:

\*      \*      \*

>     (2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*      \*      \*

>     **(b)   Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).   "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa.Super. 2010).[2]

>     Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only

---

[2] OCY also sought the involuntary termination of Father's parental rights under Section 2511(a)(1), (5), and (8), but we need only analyze Section 2511(a)(2) for purposes of this appeal.

if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Father's issues are related, and we address them together. Regarding Section 2511(a)(2), Father argues that OCY failed to present clear and convincing evidence that Father would not remedy his deficiencies as a parent. Specifically, Father maintains that he would be released from federal prison two weeks after the January 30, 2026 termination hearing. Upon his release, Father would be placed at a halfway house for two to three months before starting home confinement. Father argues that he "alleviate[d] his incapacity to care for the child" by providing the address for his home confinement and establishing that he had secured employment upon his release from prison. (Father's Brief at 18). Additionally, Father contends that he utilized the resources available to him in prison to maintain a close relationship with Child. Father concludes that the court erred and abused its discretion by terminating his parental rights under Section 2511(a)(2). We disagree.

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). Under Section 2511(a)(2), "the petitioner

for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Z.P., supra* at 1117 (quoting *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998)).

"[I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2)[.]" *In re Adoption of S.P.*, 616 Pa. 309, 328-29, 47 A.3d 817, 828 (2012). "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind … that the child's need for consistent parental care and stability cannot be put aside or put on hold." *Interest of K.M.W.*, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (quoting *In re E.A.P.*, 944 A.2d 79, 84 (Pa.Super. 2008)).

> The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "Importantly, a parent's 'recent efforts to straighten out [his] life' upon release from incarceration does not require that a court 'indefinitely postpone adoption.'" *Interest of K.M.W., supra* at 474 (quoting *In re Z.P., supra* at 1125).

- 7 -

Instantly, the court received testimony from Haley Talbott, the OCY supervisor assigned to the family until May 20, 2025. Ms. Talbott stated that Father had never been in a primary caregiving role for any of his children, including Child. Ms. Talbott described one instance where Father participated in an OCY team meeting in August 2024. Otherwise, Ms. Talbott indicated that Father did not comply with the court-ordered permanency plan. Specifically, Father did not report participation in any services available while incarcerated; Father did not demonstrate an ability to perform parental duties; Father did not make any efforts to fulfill his parental obligations; and Father did not make any sincere efforts to maintain a positive relationship with Child. (**See** N.T. Termination Hearing, 1/7/26, at 26, 43).

OCY also presented testimony from Bridgette Gerber-Winschel, the family's case worker in June and July 2025. Ms. Gerber-Winschel testified that Child was thriving in his kinship home and "expressed a desire to be adopted" during placement visits. (N.T. Termination Hearing, 1/30/26, at 18). Ms. Gerber-Winschel testified that Father had "monthly to bimonthly" phone calls with Child. (**Id**. at 22). While she believed that the phone calls were "more positive than negative," Ms. Gerber-Winschel said that Child never indicated a desire to maintain a parental relationship with Father. (**Id**.) Father has not provided any financial support to Child, nor has he sent Child any letters, Christmas or birthday cards, or gifts. Ms. Gerber-Winschel also testified that Father was not in a position to care for Child.

Next, OCY presented testimony from K.J., Child's kinship resource since March 15, 2025. K.J. described the positive progress Child has made since his placement. K.J. testified that Child is bonded with her and refers to her as "mom." (*Id*. at 33). While K.J. agreed that Father has a good relationship with Child, she testified that Father cannot be a resource for Child. Although Child has said he wants to see and spend time with Father, K.J. stated that Child has expressed a desire to be adopted by her.

In addition, Father testified in his own defense. Father stated that he would be released from federal prison on February 17, 2026, and he would move to a halfway house for "probably like two months, three months." (*Id*. at 49). Father would then move into his parents' residence and remain on home confinement for three years. (*See id.* at 50). Regarding his compliance with the permanency plan, Father claimed that he took a plumbing class while incarcerated, earned an unspecified educational "certificate," and he completed a drug program. (*Id*. at 54). Though a parenting class was available, Father explained: "I don't need no parenting class … because I'm not the, you know, perpetrator. I didn't do nothing to my child. When I left, everybody was fine." (*Id*.) In response to Ms. Gerber-Winschel's testimony that he did not send letters or gifts to Child, Father said he would "make that up when [he] come[s] home." (*Id*. at 56). When asked how much longer Child should have to wait for Father to be able to parent, Father said "my son [is] willing to wait." (*Id*. at 62). While Father acknowledged that he would

not be able to parent Child for the first few months after his release, Father insisted: "When I come home, I come home. … It won't take that long." (***Id***. at 63).

The court considered this testimony and determined that OCY provided clear and convincing evidence in support of termination:

> In the instant case, the record demonstrates, by clear and convincing evidence, that termination of Father's parental rights was proper. Father began serving a federal incarceration sentence on February 7, 2023, and had minimal, if any, contact with [Child] prior to his removal on July 16, 2024. At the time of removal, [Child] was behind medically, educationally, and his mental health was suffering.

> \* \* \*

> The reality of this matter is that Father, again as a consequence of his own choices, was never in a position to be the reunification resource for [Child]. At the time of the IVT Trial, [Child] had been in custody of [OCY] for approximately eighteen (18) months while Father remained incarcerated. Therefore, Father was never able to alleviate the conditions that led to [Child's] removal and adjudication. While the court has no doubt that Father loves [Child], it is concerning that Father fails, even after all this time, to appreciate [Child's] needs and what is in his best interest. Father truly believes [Child] should wait until Father is ready and willing to be a parent.

> \* \* \*

> As previously set forth at the time of the IVT Trial, Father was still incarcerated and not in a position to parent [Child]. Father testified he would be moving to a Halfway House in Pittsburgh the following month where he would remain for the next few months before returning to Erie to seek employment and reside with his parents. [Child] should not have to wait for Father to maybe, in the future, do what he

has been unable to do for the last three (3) years, parent his child.

(Trial Court Opinion, filed 4/21/26, at 14-15). Our review of the record supports the court's conclusions. *See In re Adoption of C.M, supra*.

We emphasize that Father's own testimony demonstrated that he did not utilize all resources available to him while in prison. Specifically, Father's failure to make frequent contact with Child, as well as his failure to finish parenting courses, demonstrated Father's non-compliance with the permanency plan. Under these circumstances, the court did not err in determining that Father's incapacity caused Child to be without essential parental care, and the causes of the incapacity cannot or will not be remedied. *See In re Z.P., supra*. Additionally, Father's plan to straighten out his life following his release from prison did not necessitate a disruption of the stability that Child currently enjoys. *See Interest of K.M.W., supra*. Thus, clear and convincing evidence supported termination of Father's parental rights under Section 2511(a)(2).

Next, Father maintains that he has a strong relationship with Child, Child expressed a desire to spend time with Father, and termination is unwarranted where there is a parent-child bond worth preserving. Additionally, Father argues that OCY failed to present evidence concerning Child's best interests. Father maintains that Child's autism diagnosis makes it unclear as to whether Child "understood the meaning of being adopted as it pertained to terminating his contact with Father." (Father's Brief at 23). Father also claims that a

social worker asked Child about permanency options including reunification with Mother and adoption, but the worker did not inquire about Child's preference for reunification with Father. Based upon the foregoing, Father concludes that the court erred and abused its discretion by terminating his parental rights under Section 2511(b). We disagree.

Under Section 2511(b), the court must consider whether termination will best serve the child's physical and emotional needs and welfare. *In re C.P.*, 901 A.2d 516 (Pa.Super. 2006).

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

*Id.* at 520 (internal citations omitted). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121 (internal citations omitted).

Instantly, the court spoke with Child prior to the second termination hearing, and the court memorialized their conversation on the record:

> I spoke to [Child] about his wishes in this matter, and I just do want to place on the record that [Child] directly told me that he wished to be adopted by [K.J]. I asked him if he knew what adoption meant. He said yes, that meant she would be his … mother.

(N.T. Termination Hearing, 1/30/26, at 5). Thus, contrary to Father's assertions, the record contains evidence that Child's autism diagnosis did not

affect his understanding of the consequences of adoption.

Additionally, the court received testimony from Sandra McIntire, a permanency worker with Family Services of Northwest PA. Ms. McIntire reiterated Child's wish to be adopted: "[Child] said he wanted [K.J.] to adopt him and he says he wants to stay with [K.J]." (N.T. Termination Hearing, 1/7/26, at 94). Ms. McIntire further described Child's "life book," which is a tool she utilized to assist Child with processing his feelings: "[T]he first [page] is asking him what he wants for his future, his answer strictly was [K.J.], and the second page is where he wants to live is with [K.J]." (*Id*. at 95). Included in Child's life book was a "happy face," which Child said represented him and K.J. being together. (*Id.* at 94).

Further, Ms. Gerber-Winschel and K.J. testified about Child's best interests. Ms. Gerber-Winschel stated that termination of Father's parental rights was in Child's best interests. Moreover, Ms. Gerber-Winschel testified that terminating Father's parental rights would not be detrimental because "[Child's] been unwavering in almost every, if not every, placement visit in saying that he wants to be adopted." (*Id*. at 23). K.J. added that adoption was in Child's best interest because it will facilitate "having his mental health in order, his schooling, his life period." (*Id*. at 39).

On this record, the court found that the involuntary termination of Father's parental rights was in Child's best interest:

> [Child] was placed in kinship care with [K.J.] in March of 2025 and remained in that home at the time of the IVT Trial.

- 13 -

> By all accounts, … [Child] is thriving in [K.J.'s] home, and all his needs are being met. Moreover, he refers to [K.J.] as "Mom" and wishes to be adopted by her. **[K.J.'s] home has provided him with stability, consistency and security and that should not be taken away from him in the hopes that Father will someday be able to safely care for him.**
>
> While the … court recognizes that Father and [Child] have a bond and enjoy phone conversation, it is also apparent that [Child] has a bond with [K.J.] and looks to her, not Father, to meet his physical and emotional needs. [Child] is thirteen (13) years old and despite his autism diagnosis, able to communicate his needs and wishes. It is his wish to be adopted by [K.J.] and he deserves the permanency that she has and can continue to offer him as opposed to the unknown that is Father.

(Trial Court Opinion at 15-16) (emphasis added). Our review of the record confirms the court's conclusions. *See In re Adoption of C.M., supra*.

Regardless of any bond between Father and Child, terminating Father's parental rights does not destroy an existing, necessary, and beneficial relationship for Child. *See In re Z.P., supra*. Child can achieve permanency with K.J., who has provided Child with necessary care since his placement. Based upon the foregoing, we cannot say that the court erred in terminating Father's parental rights. Accordingly, we affirm the decree for involuntary termination of Father's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 8/12/2026